ATWOOD-STONE COMPANY, Appellant, v. LAKE COUNTY BANK, Respondent.

(161 N. W. 539.)

(File No. 3815. Opinion filed February 16, 1917. Rehearing denied May 23, 1917.)

1.   Banks and Banking—Debtor's Deposit from Third Person's Advances, Used to Pay Debtor's Note to Bank—Misappropriation by Bank Officer—Bank's Knowledge, Effect—Trust Fund.

Funds advanced by plaintiff to a firm for the sole purpose of buying grain, and deposited in defendant bank in the form of sight drafts drawn on plaintiff by said firm, and used by the bank in payment to it of said firm's notes, held by the bank, but assigned without recourse to it by the payee, who was its president, constituted a misappropriation of such money by the bank, and, if the bank had knowledge of, or can legally be charged with notice of the agreement between plaintiff and said firm under which the money was advanced, and under all the facts such money so misappropriated constitutes a trust fund, either under an express or constructive trust, then the bank is liable therefor to plaintiff.

2.    **Same—Grain-buying Funds Deposited, Arrangement for—Knowledge of Bank Officer, Whether Notice to Bank—Misappropriation to Payment of Bank's Notes.**

Plaintiff's agent, in arranging for money advances to a firm for the sole purpose of buying grain, explained to defendant bank's president the nature of such arrangement, and inquired of the business and financial standing of the grain firm, explaining that the money was to be furnished said firm for said purpose. Held, that the bank, in thereafter appropriating a portion of said advances, theretofore deposited in its bank, to the payment of notes given to the bank's president by said grain firm and by the payee endorsed without recourse to the bank, is chargeable with notice of the facts known to the president; that the moneys so appropriated to pay said notes were misappropriated; and that the knowledge of the president was gained in his capacity as president, and not in his private capacity.

Appeal from Circuit Court, Minnehaha County. Hon. JOSEPH W. JONES, Judge.

Action by the Atwood-Stone Company, against the Lake County Bank, to recover from defendant the amount of certain money advances by plaintiff to third persons for a specific purpose, and alleged to have been wrongfully diverted by defendant. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Reversed.

*Tore Teigen,* and *E. J. Grover,* (O'Brien, Young & Stone of Counsel), for Appellant.

*Charles J. Porter,* and *Aikens & Judge,* for Respondent.

(2.) To point two of the opinion, Appellant cited: Civ. Code, Secs. 1616, 1687; Allen v. Puritan Trust Co., (Mass.) 97 N. E. 916 (919.); American National Bank v. Fidelity and Deposit Co., 129 Ga., 126, 12 Am. and Eng. Annot. Cases, 666;

Bank of Hickory v. MacPherson, 59 So., 954 (937); Emerado Farmers Elevator Co. v. Farmers Bank, 127 N. W. 522; Wojahn v. National Union Bank, 129 N. W. 1068; Mechem on Agency (2nd Ed.) Sec. 1831; Black Hills National Bank of Rapid City v. Kellogg, 4 S. D. 312, 56 N. W. 1071; Bank v. Harvey, 29 S. D. 284, 137 N. W. 365; Holden v. N. Y. & Erie Bank, 72 N. Y. 286; Citizens' State Bank v. Rowe, (S. D.) 153 N. W. 939; Brookhouse v. Union Publishing Co., 2 L. R. A. (N. S.) 993; Lilly v. Hamilton Bank, 29 L. R. A. (N. S.) 558; First National Bank v. Burns, 49 L. R. A. (N. S.) 764; 3 Ruling Case Law, Sec. 104.

Respondent cited: Bernham v. Barth, 62 N. W. (Wis.) 96; Dowey v. Humphrey, 64 Id. 315; Atlantic State Bank v. Savery, 82 N. Y. 291; Nat. Bank of Commerce v. Feeney, 9 S. D. 550; Hanson v. Roush, 116 N. W. (Ia.) 1061; In re Plankinton Bank, 58 Id. (Wis.) 784; Brookhouse v. Union Pub. Co. (N. H.) 2 L. R. A. (N. S.) 933; Paragraph 5, Cyc. §462; Bank v. Montgomery, 85 N. W. (Mich.) 879 and cases cited; Henry v. Allen, 151 N. Y. 1; Bank v. Clark, 139 N. Y. 307.

POLLEY, J. In this action plaintiff seeks to recover from defendant, on account of certain money that had been advanced by plaintiff for a specific purpose, but which plaintiff alleges to have been wrongfully diverted to another purpose by the defendant. Plaintiff is engaged in business as a grain and commission merchant at Minneapolis and Duluth, Minn. Defendant was engaged in the banking business at Madison, S. D.; and Larkin & Metcalf was a copartnership located at Madison and engaged in the grain and milling business. Besides a mill at Madison, they owned and were operating ten elevators, situated in various towns in eastern South Dakota. On the 11th day of August, 1910, plaintiff and the said Larkin & Metcalf entered into an arrangement whereby plaintiff was to furnish certain sums of money to Larkin & Metcalf for the purpose of purchasing grain at said elevators. Ten separate written contracts were entered into, each similar to the others except that each contract contained the name of a different town at which one of said elevators was situated. The material portions of said contract read as follows:

"Whereas, said first party has made arrangements with said second party for moneys to be advanced by said second party to said first party for the purchase of grain, etc.:

"Now, therefore, it is mutually agreed by and between the said parties that said first party shall draw upon the said second party from time to time for moneys needed to purchase grain, it being understood that the amount of indebtedness due by virtue of said advances shall at no time exceed the sum of seven thousand five hundred ($7,500.00) dollars; and in consideration of said second party's agreement herein said first party agrees that during the period of the existence of, and indebtedness herein referred to, for moneys heretofore or hereafter advanced, or otherwise, to consign for sale and ship to said second party all grain shipped from said elevator, and to pay the said second party commissiones in accordance with the rules of the Chamber of Commerce of Minneapolis or Duluth, Milwaukee, or Chicago, as the case may be, for the sale of such grain; and for the purpose of securing the payment of all moneys heretofore advanced, or which may hereafter be advanced, by said second party to said first party, and interest thereon, and any and all notes which have heretofore or may hereafter be given by said party for any of such advances, the said party hereby grants, bargains, sells, mortgages, and conveys unto the party of the second part and its assigns the said elevator above described, together with all its appurtenances, machinery, and all other personal property, including all grain and seeds now contained therein, or which hereafter shall be placed therein by said first party. Said money is advanced for purchasing grain and storing in said elevator until such time as the same can be shipped to Atwood-Stone Company. .

"And it is further understood that this contract is to cover all grains and seeds of whatever nature and kind that may be placed in the said above-described elevator any time during the next 12 months from the date of this instrument as security for all advances of money made under this contract by Atwood-Stone Company, and that said contract is given as security for all intents and purposes the same as if a separate contract or mortgage was taken each and every time that an advancement of money was made and that grain was bought with said money and placed in said elevator.

"It is further understood that the title to all grain and seeds placed in said elevator after the date of this contract be and remain in the said Atwood-Stone Company. * * *

"Said first party agrees continually to keep said property fully insured and to furnish said second party the policies of insurance with clause attached, 'Loss, if any, payable to Atwood-Stone Company as its interests may appear,' said policies to be kept by said second party in a safe and secure place and to be delivered to said first party at any time, upon termination of this contract, and said first party agrees to keep an accurate account of all grain and seeds bought, shipped, or sold and make reports at any time when called on to do so by said second party.

"This contract can be terminated at any time by said first party upon the payment of all indebtedness due to said second party. Whenever said indebtedness becomes due and unpaid, or whenever said second party deems itself unsafe and insecure, it may enter upon said premises of the first party and take possession of the said mortgaged property, and sell and dispose of the same in manner provided by law for the foreclosure of chattel mortgages, with the usual costs of foreclosure.

"Second party also agrees to receive all grain consigned to them by said first party and to use their best efforts to secure the said first party the highest grade possible for such grain and to sell the same at the best price possible and to send to said first party, promptly, account sales showing all transactions of sale. * * *"

At the time of executing said contracts Larkin & Metcalf executed and delivered to plaintiff ten promissory notes for $7,500 each, and payable one year from date. At or just prior to the time of the execution of the said contracts an officer of the plaintiff company called at defendant's bank for the purpose of ascertaining the business and financial standing of Larkin & Metcalf, and while there explained to the president of defendant's bank the nature of plaintiff's arrangement with Larkin & Metcalf. Said president also saw and read one of said contracts at about the time it was signed. Pursuant to the terms of said contracts, plaintiff advanced to Larkin & Metcalf the sum of $346,844.71, of which sum Larkin & Metcalf accounted for $324.142, leaving a balance due plaintiffs of $22,702.71.

Plaintiff's alleged right of recovery is based upon the following facts: Prior to the 10th day of June, 1910, Larkin & Metcalf were indebted to the defendant to the extent of some $20,000. On that day they negotiated a loan of $50,000 through John Wadden, the president of the defendant bank. This loan was evidenced by four promissory notes as follows: One for $10,000, payable August 15, 1910; one for $10,000, payable September 1, 1910; one for $20,000, payable September 15, 1910; and one for $10,000, payable October 1, 1910. It is the contention of plaintiff that this loan was made by the defendant bank, and that the bank alone was interested therein; while it is defendant's contention that said loan was made by Wadden as a matter of private business, and that the bank had no interest therein. It is a fact that the notes on their face were payable to John Wadden, and that the mortgage that was given to secure the payment thereof ran to Wadden. In other respects it appears to have been strictly a bank transaction. No money ever passed from Wadden to Larkin & Metcalf in consideration for the notes, but the notes were deposited in the bank by Larkin & Metcalf as so much cash, and a credit given them for an amount equal to the face of the notes. The transaction was entered in the bills payable record of Larkin & Metcalf as a loan from the bank. The interest on the notes from the date to maturity was paid in advance. This was charged in the first instance to the bank, and no account of it ever rendered to Wadden, and no part of it ever paid to him. One of the notes was in evidence at the trial. It appears to have been indorsed without recourse by Wadden, and all of said notes entered on the books of the bank the next day after they were executed, and it is not suggested that any consideration for said notes ever passed from the bank to Wadden.

It will be remembered that the contracts between plaintiff and Larkin & Metcalf were executed on the 11th day of August, just four days prior to the maturity of the first of the Wadden notes, and John Larkin, of the firm of Larkin & Metcalf, testified that he promised Wadden, on the 12th day of August, that he would pay the notes out of the money to be advanced by plaintiff under said contracts, and that he would reduce the amount as fast as he could make drafts on Atwood-Stone Company without arousing their suspicion as to how they (Larkin & Metcalf) were disposing of plaintiff's money. He told Wadden that he

could not pay more than $5,000 or $10,000 at a time, because he could not draw on Atwood-Stone Company for any more than that at any one time. He also told Wadden that the money was furnished to his firm to buy grain with, and that he could not pay the whole amount at any one time. Pursuant to this arrangement with the president of the bank, Larkin & Metcalf, on the 15th day of August, deposited in defendant's bank the sum f $11,000 of plaintiff's money; and from this sum the first of e Wadden notes for $10,000 was paid. On the 1st day of September following Larkin & Metcalf again deposited $11,000 of plaintiff's money, and from this amount the second of the Wadden notes for $10,000 was paid. On the 13th and 15th days of September Larkin & Metcalf deposited in defendant's bank the sum of $21,000 of plaintiff's money, from which amount the third of the Wadden notes for $20,000 was paid. On the 1st day of November Larkin & Metcalf deposited $3,000 of plaintiff's money which was applied on the fourth of the Wadden notes for $10,000. A portion of the above sum of money was in the form of checks on another bank, and on the face of which check there was nothing indicating the source from which such money was derived; but at least $30,000 of said money went into defendant's bank, in the form of sight drafts, drawn by Larkin & Metcalf on the plaintiff, so that, as to this amount, there could be no question as to the source from which the money came. The evidence shows, and the trial court found as a fact:

"That said John Wadden, deceased, who was defendant's president, * * * did have notice of the contracts (with plaintiff) and of their terms and conditions, and did, with such notice, accept from the said Larkin & Metcalf, and apply on their indebtedness to him, individually, $45,000 of the money advanced by plaintiff to said Larkin & Metcalf under the terms and conditions of said contracts."

But the court also found that in so doing the said John Wadden did not represent the defendant, and that defendant had no knowledge of any diversion of any funds in which plaintiff was interested, and that defendant had no knowledge of any facts or circumstances that would indicate that any funds in which plaintiff was interested were being diverted or converted by the said Larkin & Metcalf. This latter finding, however, is based upon the

theory that the knowledge of Wadden, the president of the bank, could not be imputed to the bank itself.

[1] The money that was used to pay the Wadden notes was not paid directly to Wadden by Larkin & Metcalf, but was paid by the bank out of funds that had been furnished by plaintiff to be used by Larkin & Metcalf for the purpose of buying grain. This was a misappropriation of such money, and, if the bank had knowledege or can legally be charged with notice of such misappropriation, and under all the facts such money so misappropriated constitutes a trust fund, either under an express or constructive trust, then it is liable. It is conceded that the president of the bank had full knowledge of all the facts and circumstances under which said money was deposited in defendant's bank.

[2] The question then to be determined is: Should the knowledge of the president of the bank be imputed to the bank under the circumstances as they appear in this case? The bank being a corporation, an artificial person, could have knowledge only through the knowledge of some of its officers or agents, but it is contended by defendant that, in order that the knowledge of an officer of the bank can be imputed to the bank, such knowledge must have been acquired by such officer in his official capacity. Quoting from Bank v. Savery, 82 N. Y. 291, respondent says:

"He was one of the officers of the bank, but from this fact alone nothing can be inferred. If the knowledge of the director was acquired in his official capacity, the bank also is presumed to have it; but if it was acquired as any private person might have acquired it, the bank is not charged"—citing Bank v. Clark, 139 N. Y. 307, 34 N. E. 908, 36 Am. St. Rep. 705; Bank v. Cornen, 37 N. Y. 320, 93 Am. Dec. 573; Bank of U. S. v. Davis, 2 Hill (N. Y.) 463; First Nat. Bank v. Gifford, 47 Iowa, 575; Wickersham v. Zinc Co., 18 Kan. 481, 26 Am. Rep. 784.

But in this case Wadden (the president of the bank) did not acquire his knowledge as any private person might have acquired it; he acquired it in his capacity as president of the bank. He gained his knowledge in the first instance from the witness McClellan, who, as an agent of plaintiff, called at defendant's bank and consulted Wadden as president of the bank relative to the financial and business standing of Larkin & Metcalf. In the conversation that took place at that time McClellan explained to

Wadden the nature of the business that was to be conducted by Larkin & Metcalf, and told him the money that was to be furnished by plaintiff was to be used exclusively for the purpose of buying grain to be shipped to plaintiff. In Bank v. Feeney, 9 S. D. 550, 70 N. W. 874, 46 L. R. A. 732, this court held, under the facts in that case, that knowledge of the cashier of the bank could not be imputed to the bank. But in that case the cashier was a member of a firm that was doing business with the bank. The transaction consisted of the negotiation of certain promissory notes. The cashier of the bank was representing the firm that was selling the notes to the bank. The bank was represented in the transaction by its discount committee, of which the cashier was not a member. It was held that knowledge gained by the cashier as a member of the said firm could not be imputed to the bank. In this case the knowledge of the president of the bank was gained in his capacity as president of the bank, and when he was not representing any other interest than that of the bank. Under these circumstances we believe the bank should be charged with notice of the facts known by the president.

In Black Hills Nat. Bank v. Kellogg, 4 S. D. 312, 44 N. W. 1071, this court held that the bank was charged with the knowledge of its cashier. The same rule was followed in Bank v. Harvey, 29 S. D. 284, 137 N. W. 365, and again in Bank v. Rowe, 36 S. D. 151, 153 N. W. 939. The same rule should be applied in this case, and the defendant held to have had notice that the funds then in its possession, but furnished by plaintiff for the purpose of purchasing grain, were being diverted to another and unauthorized purpose.

The judgment and order appealed from are reversed.